IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **Alexis Carlito-Garcias** § | | |
| **Individually and as** § | | |
| **Heir of Christopher Lowe** § | | |
| § | | |
| **Plaintiff,** § | | **Civil Action No.** |
| § | | |
| VS. § | | _____ |
| § | | |
| **City of Fort Worth, Texas; Scott Smith;** § | | |
| **Christopher Golden; Mitchell Miller;** § | | |
| **Taylor Stephens; Daniel Pritzker;** § | | |
| **Andrew Scharf; and Hans Fellhauer,** § | | |
| § | | |
| **Defendants.** § | | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

Alexis Carlito-Garcias, Individually and as heir of Christopher Lowe, claims that Defendants caused Christopher Lowe's death and violated his rights under the United States Constitution.

I. JURISDICTION AND VENUE

1. Plaintiff brings this action under the U.S. Constitution and 42 U.S.C. §1983. Jurisdiction is based on 28 U.S.C. §§1331, 1343(a)(3)-(4).

2. Venue is proper in this Court under 28 U.S.C. §1391(b)(1)-(2) as the county in which all or part of the cause of action arose.

## II. PARTIES

3. Plaintiff Alexis Carlito-Garcias is the surviving sister of Christopher Lowe. Mr. Lowe died with no spouse, no children, no parents, no will and no substantial assets or debts and thus, there was no necessity for probate. Ms. Carlito-Garcias, as the surviving heir of Christopher Lowe, is the proper party Plaintiff.

4. At all relevant times, the Defendant officers acted as agents and employees of the City of Fort Worth under color of law. As such, they were responsible for upholding the laws of the United States and Texas.

5. Defendant City of Fort Worth can be served through Betsy Price, Mayor and/or the city secretary at 200 Texas St., Fort Worth, Texas 76102.

6. Defendant Hans Fellhauer is an individual that may be served at 3709 Bandera Ranch Rd., Roanoke, Texas 76262.

7. Defendant Christopher Golden is an individual that may be served at 1013 Idlewood Ave., Azle, TX 76020.

8. Defendant Mitchell Miller is an individual that may be served at 5209 Bryant Irvin Rd., #95, Fort Worth, TX 76132.

9. Defendant Daniel Pritzker is an individual that may be served at 1172 Blue Rider Court, Benbrook, Texas 76126.

10. Defendant Andrew Scharf is an individual that may be served at 732 Hemlock Trail, Saginaw, Texas 76131.

11. Defendant Scott Smith is an individual that may be served at 8629 Running River Lane, Fort Worth, TX 76131.

12.     Defendant Taylor Stephens is an individual that may be served at 309 Prince John Dr., Fort Worth, Texas 76179.

## III. STATEMENT OF FACTS

13.     This case arises out of the death of Christopher Lowe who died in custody of the Fort Worth police on July 26, 2018.

14.     On July 26, 2018, Defendant Scott Smith was dispatched to a "prowler" call at a residence in Fort Worth.  When Defendant Smith arrived at the location, he saw Christopher Lowe sitting near the front of a white SUV that was parked in the resident's driveway.  Mr. Lowe was holding what appeared to be a small pipe and banged it lightly on a gate or metal bar.

15.     At the time that Smith arrived, the resident of the house at which this was occurring was standing on the front porch, calmly watching Mr. Lowe.  There was another person standing in the yard, who began conversing with Defendant Smith.  Smith told that person that Lowe was "not really hurting anything right now" and that he, Smith was going get some back up.  Smith asked the various people standing around if they knew the person that was lightly banging the pipe and they responded that they did not.

16.     Defendants Miller and Golden next arrived on the scene.  At that time, Mr. Lowe discarded the object in his hand.  One of the officers yelled "let's go! grab him!"  and they moved in to take Lowe into custody.  Defendant Miller threw Lowe onto his back.  Lowe did not resist or struggle and responded with "ok, ok."  Mr. Lowe did not refuse any commands, resist or struggle at any time during the entire encounter.

17.     Mr. Lowe was commanded to roll onto his stomach and put his hands behind his back.  He told the officers that he was sick.  He complied with their commands and responded with "yes sir" to commands while he was handcuffed.

18. The officers then directed Mr. Lowe to stand. He explained that he could not. Mr. Lowe was on his knees and he was directed to push his legs up and stand up. Mr. Lowe began to slump over on his side. Ignoring Mr. Lowe's obvious and noted distress, Defendant Smith yelled at him to "STAND UP!" Defendants Miller and Golden yanked Mr. Lowe up by his cuffed hands.

19. When Mr. Lowe was yanked to his feet, he was directed by Smith to "WALK!" even as Smith noted that Mr. Lowe's "eyes [were] bugged out." Officers Golden and Miller began walking Mr. Lowe down the driveway toward the street. Mr. Lowe once again began to slump to the ground when he was yanked back up and told to "stand and walk!" Mr. Lowe said again, "I'm sick." He once again began to slump and the officers dragged him for several steps before he was able to regain his footing. Mr. Lowe informed the officers that he was sick and that he was dying. It was ignored.

20. When the officers once again yanked Mr. Lowe to his feet, he tried to stop them and/or get their attention, crying out "wait, wait, wait, wait, wait." Defendant Miller's response was "you fall again, I'm just gonna let you fall." Mr. Lowe clearly stated "I can't breathe" and again "wait, wait, wait, wait, wait!" Golden's response was "don't pull that shit."

21. At that point, Mr. Lowe was slumped over with Defendants Golden and Miller holding him up in the street. It was very clear that Mr. Lowe was in extreme physical distress and unable to walk or stand on his own. In response to further instruction to "walk," Mr. Lowe once again stated that he could not.

22. During the encounter where the officers were forcing/dragging Mr. Lowe toward the patrol car, additional officers arrived. Mr. Lowe told the assembled officers "I can't breathe." The officers again completely ignored Mr. Lowe's protestations and physical condition and

continued to force him toward the patrol vehicle. Mr. Lowe slumped forward, crying out "aarghhhhhhhh" and then "NO, I CAN'T BREATHE!" The only response was from Defendant Miller, who said "yeah, you can." Lowe told the officers that he was dying. There was no response.

23. Defendant Pritzker arrived and took over for Miller. He helped force Mr. Lowe into the back of the patrol car. Mr. Lowe again cried out. The response from an [as yet unidentified] officer was "you spit on me, brother, and I'm gonna put your face in the f****** dirt!"

24. None of the officers took any action whatsoever to acknowledge Mr. Lowe's distress. None of them called for an ambulance, called for assistance, moved to transport Mr. Lowe to the hospital or took any steps to provide aid for Mr. Lowe.

25. Instead, the officers stood around in a group talking to each other at the scene. Defendant Smith told the group at that time about Mr. Lowe's behavior, symptoms and that he had complained of his inability to walk or breathe.

26. During the group discussion, it was determined that Golden would transport Mr. Lowe to the 10th floor of John Peter Smith Hospital for an emergency mental detention. Defendant Pritzker advised Defendant Golden to withhold information from hospital personnel by omitting the fact that they believed that Lowe was under the influence of narcotics in order to keep Lowe from having to be cleared medically before being admitted for the emergency mental detention and in order to avoid a hospital guard detail (signal 78). During this discussion, Defendant Stephens also advised to take Lowe "straight up and don't say anything else." Another officer added "don't say anything about the dope. He's just acting crazy."

27. After Defendant Smith had briefed all of the Defendants about Mr. Lowe's distress, Mr. Lowe began to bang his head against the interior of the patrol vehicle as a call for help.

Defendants Fellhauer and Golden went to talk with Lowe. Golden told Lowe "if you keep banging your head, I'm going to spray my pepper spray in there and it's gonna be worse." Mr. Lowe told them that he needed to go to the hospital. Defendant Golden told Lowe that they needed to know his name before they could take him to the hospital. They obtained Lowe's identification and yet no ambulance was called and no effort made to transport him.

28. Almost twenty minutes after Defendant Smith had encountered Mr. Lowe and recognized his symptoms of distress, they discovered Lowe unresponsive in the back the patrol car. Finally, an ambulance was called, but it was too late and Mr. Lowe was pronounced dead after he was transported to JPS Hospital.

29. Mr. Lowe died of acute cocaine intoxication. His death could have been prevented. With rapid response, cocaine overdoses can be treated. In the field, measures can be taken to cool a person down and, most importantly, to keep them calm. The Defendants did the opposite. More importantly, getting someone to a hospital immediately can change the outcome as giving an individual in such condition a sedative lowers their blood pressure and heart rate as well as substantially reduces any chance of heart attack or stroke.

## IV. CAUSES OF ACTION

30. All allegations contained in paragraphs 13 through 29 above are hereby incorporated into these counts of Plaintiff's Complaint.

31. Christopher Lowe's rights were violated in contravention of the Fourth and Fourteenth Amendments of the United States Constitution. Mr. Lowe died as a direct result of being denied medical attention by Fort Worth police officers who were deliberately indifferent to his serious medical condition, and the decisions made were objectively unreasonable under the circumstances.

A.     THE INDIVIDUAL OFFICERS

32.    Plaintiff sues the individual officers, under 42 U.S.C. § 1983 for violations of Mr. Lowe's Fourth and Fourteenth Amendment rights in that they violated Mr. Lowes' due process interests in his bodily integrity and right to receive necessary medical care and were deliberately indifferent to his medical needs in violation of the Fourteenth Amendments and restrained Mr. Lowes' liberty in violation of the Fourth Amendment.

33.    Defendant officers consciously disregarded a known and excessive risk to Mr. Lowe's health and safety, amounting to deliberate indifference.  The conduct was unjustified by any government interest and rose to the level that shocks the conscience.  The actions were objectively unreasonable and no officer under the circumstances would have ignored his obviously declining condition, his state of medical crisis, his repeated statements that he could not breathe, his statements that he was dying, his inability to stand or walk without assistance, his repeated collapsing even while assisted, and his statement that he needed to go to the hospital.  Had the Defendant acted reasonably, in all reasonable probability Mr. Lowe's life would have been saved.  He could have received flushing of his system and a sedative to slow down his processing of any substances, both of which would have changed the outcome in this case and allowed him to survive.

34.    The Defendant officers each had an understanding of the dangerousness of narcotics and that their use could cause serious injury or be fatal.  They were admittedly aware that Mr. Lowe needed medical assistance.  The officers' group discussion was directly to the point that Mr. Lowe needed medical assistance. However, the officers apparently were unwilling or reluctant to

take Mr. Lowe to the hospital for medical treatment as it would have involved one or more of them doing guard duty—standing guard over Mr. Lowe at the hospital. Thus, the officers conspired to transport Mr. Lowe, instead, to John Peter Smith mental health facility and cover up the fact that he was overdosing in order to avoid hospital guard detail. The deliberate indifference of the officers is extremely clear not only from their hostile responses to his pleas for assistance (including but not limited to threatening to pepper spray him in response to his plea to go to the hospital), but their scheme and/or willingness to actually lie about his need for medical assistance and avoid getting him the medical help he needed.

35. Plaintiff sues Defendant officers under 42 U.S.C. § 1983 for violations of Mr. Lowe's Fourth and Fourteenth Amendment rights in that they violated Mr. Lowe's due process interests in his bodily integrity and right to receive necessary medical care, were deliberately indifferent to his medical needs in violation of the Fourteenth Amendment and restrained Mr. Lowe's liberty in violation of the Fourth Amendment.

36. At no time during the events described herein were Christopher Lowe's serious medical needs addressed. Mr. Lowe was handled in total disregard for the emergency nature of the situation. Further, reasonable personnel would understand the need for immediate response to the situation and the potential risk for harm if Mr. Lowe's obvious medical needs were willfully and unlawfully ignored.

37. Defendants consciously disregarded a known and excessive risk to Mr. Lowe's health and safety, amounting to deliberate indifference. The conduct was unjustified by any government interest and rose to the level that shocks the conscience. The actions were objectively unreasonable and no officer under the circumstances would have ignored his obvious state of medical crisis. The officers violated Mr. Lowe's known constitutional right to receive

medical care for an obviously serious medical need and that right was clearly established at the time of the encounter.

B.   CITY OF FORT WORTH

   1.   PATTERN

38.   There has long been a pattern of instances of encounters between Fort Worth police officers and purported detainees resulting in the death of the detainee from a failure to provide/obtain medical care.  Despite this pattern, the City failed to adopt policies or provide training to its officers with respect to providing/obtaining medical care for detainees.

   Alisha Trevino:  In April 2015, Ms. Trevino was a passenger in a vehicle seen leaving a "game room" in Fort Worth.  The vehicle was pulled over by officers for an inoperable brake light.  Ms. Trevino was detained in the back of a patrol vehicle.  She began to vomit and exhibit signs of serious illness, including shaking and uncontrollable movements.  She told the officers she was sick and having seizures.  Despite all of this, there was no effort to provide assistance, obtain medical care or transport her to the hospital for a period of approximately an hour and a half.  She was eventually taken by ambulance to the hospital, where she died.   Fort Worth policymakers were certainly aware of this event as a lawsuit was brought against the officers and the City.

   Madars Vajevskis:  In July 2018, Mr. Vajevskis sustained severe injury, including a collapsed lung, by Fort Worth police during his arrest.  Despite Mr. Vajevskis repeated assertions of injury and pleas for medical care, the police refused to transport him to the hospital or obtain medical assistance.  Instead, Mr. Vajevskis was transported to jail, where it was discovered that he had sustained injury and he was rushed to the hospital for emergency surgery.

Again, Fort Worth policymakers were aware of the incident as Mr. Vajevskis filed a lawsuit against the City of Fort Worth and the Fort Worth Police Department.

<u>Phillip Vallejo</u>:   In July 2015, Phillip Vallejo and his wife had dinner at a Fort Worth restaurant.  As they left, there was a brief altercation with other patrons.  Mr. and Mrs. Vallejo then stood by their vehicle discussing the situation.  A Fort Worth police officer arrived and, inexplicably, shot Mr. Vallejo repeatedly in the back.  After Mr. Vallejo collapsed to the ground, bleeding profusely from the bullet wounds, the officer handcuffed him while Mr. Vallejo cried out for help, stating that he could not breathe.  Other officers were also present and all ignored Mr. Vallejo's pleas and obvious serious distress, responding by yelling at Mr. Vallejo to "shut the f*** up."  Even after paramedics arrived, the officers refused to allow them to treat Mr. Vallejos while they examined the manner of entrance/exits of the bullets and concocted a version of events different than what occurred, failing themselves even to provide basic aid.  Mr. Vallejo was pronounced dead at the hospital.   Again, Fort Worth policymakers were aware of the incident as Mr. Vallejo filed a lawsuit against the City of Fort Worth and the Fort Worth Police Department.

<u>Jermaine Darden:</u>   In May 2013, Fort Worth police raided a home and encountered, among others, Jermaine Darden laying on a couch.  They wrestled Mr. Darden to the floor, where he was gasping for breath, telling the officers that he could not breathe and others were notifying the police that he was asthmatic and could not breathe.  Despite this information, the officers ignored his pleas regarding his medical condition, failed to provide him assistance and failed to obtain medical treatment for him.  Mr. Darden died as a result of the encounter.  Fort Worth policymakers were aware of this event as a lawsuit was brought against the officers and the City.

<u>Ruben Vasquez</u>:  In April 2011, Fort Worth police broke Mr. Vasquez's wrist while taking him into custody.  Despite Mr. Vasquez's requests for medical assistance and pleas for medical aid, his requests were ignored.  Mr. Vasquez filed suit for his injury, asserting that the failure to provide medical care caused the break to heal improperly and caused permanent damage.

<u>Lance Revalee</u>:  In April 2014, Fort Worth police were called to an intersection where a male was acting strange and trying to open car doors.  He was exhibiting erratic behavior and appeared to be overdosing on narcotics.  Instead of transporting Mr. Revalee to the hospital or obtaining medical assistance, the police transported him to jail, where he died.

<u>Allen Durham</u>:  In August 2014, Fort Worth police encountered Mr. Durham who was acting erratically and unable to communicate coherently.  He was sweating profusely in 77 degree heat and obviously confused.  Instead of transporting Mr. Durham to the hospital or obtaining medical assistance, the police transported him to jail, where he died of a drug overdose.

<u>Michael Jacobs</u>:  In April 2009, Fort Worth police were called to a residence where a young man was in a state of a mental health crisis and his parents were asking for help to get him medical assistance.  The police arrived at the scene and paramedics also arrived.  Despite the fact that it was a call for medical assistance and despite Michael Jacobs' obvious mental distress, the police officers directed the paramedics to leave the scene.  One of the officers then deployed a taser on Michael Jacobs for 49 seconds while his mother was yelling that the officer was killing her son.  The officers subsequently had the paramedics return and Michael Jacobs was transported to the hospital, where he was pronounced dead.  Again, Fort Worth policymakers

were aware of the incident as the family of Mr. Jacobs filed a claim against the City of Fort Worth and the Fort Worth Police Department, which was resolved through mediation.

39.     Plaintiff has listed the many instances where officers refused to provide medical assistance and ignored pleas for treatment and/or obvious signs—even to a layperson—of serious medical need, resulting in the death of the detainee.  In none of these cases was the individual convicted of a crime and they were denied medical care for a serious medical need in contravention of the Fourteenth Amendment.  Plaintiff asserts that there are other—perhaps many other—instances of such conduct that may not have resulted in a lawsuit and would seek permission from the Court to conduct discovery against the City to ascertain all other instances/complaints of a failure to provide or obtain medical assistance in the face of obvious need.  However, even without additional instances of such conduct, there is a sufficient pattern of deliberate indifference to a serious medical need to establish a claim for the failure of the Fort Worth police to train officers and/or establish necessary policies.

     2.     POLICYMAKERS WERE NOTIFIED OF CLAIMS AND CHOSE NOT TO ACT

40.     The Fort Worth Chief of Police is the "policymaker" with respect to General Orders applicable to officers obtaining medical treatment for persons being taken into custody asking for medical treatment or exhibiting signs of medical distress.  The authority to address policies relating to such issues is delegated to the Chief in the Fort Worth Municipal Code.  Pursuant to the Fort Worth Municipal Code Part II, Chapter 1, section 1-2:

> **DELEGATION OF AUTHORITY.** Whenever a provision appears requiring a city officer or employee to do some act or make certain inspections it is to be construed to authorize the head of the department to designate, delegate and authorize subordinates to perform the required act or make the required inspection unless the terms of the provision or section designates otherwise.

41.     In Fort Worth Municipal Code, Chapter 27, Art. II, the duties of the Chief of Police are addressed specifically.  The Chief of Police is tasked with the administration and operation of the police department including the "promulgat[ion of] all rules, regulations and orders for the governing of the police department."

42.     The Personnel Rules and Regulations for Commissioned Police Officers ( "PDPRRs") of the City of Fort Worth are authorized under the City of Fort Worth Municipal Code, Chapter 2, Article V.  The PDPRRs state that "[t]he Police Chief may generally approve departmental policies (General Orders) that are more restrictive or controlling than policies in these PDPRRs so long as they do not conflict with federal, state or local law, or any then-applicable labor agreement."

43.     Thus, the policymaker with respect to the General Orders governing obtaining medical treatment for detainees is the Fort Worth Chief of Police.  Each of the lawsuits and claims listed above was reported to both the Chief of Police and to the City Council.  The relevant policymaker was aware of the need for a policy addressing the provision of medical services for those in obvious need and made a deliberate decision not to promulgate such a policy or provide training to officers in that regard.

   3.     DE FACTO PRACTICE, LACK OF POLICIES/TRAINING

44.     It was not until August 10, 2018, after the death of Christopher Lowe, that the Fort Worth Police Department adopted a policy stating that an officer shall "<u>immediately</u> provide medical attention" whenever a person "requests medical attention or exhibits signs of medical distress or possible medical distress."  (emphasis added).  Such a policy could have and should have been adopted years earlier, particularly in light of the number of instances of serious injury and/or

death as a result of failing to provide medical attention when people requested medical attention and/or exhibited clear signs of medical distress.

45. In light of the fact that Mr. Lowe both specifically and repeatedly notified the officers of his distress and need for medical assistance, as well as his obvious medical distress, a policy such as the one described above was obviously necessary and, in all reasonable probability, would have saved his life.

46. A failure to adopt a policy and/or failure to train can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights.  It was obvious to Fort Worth policymakers for years prior to Mr. Lowe's death that failing to adopt a policy/train requiring officers to immediately provide medical attention whenever someone exhibits signs of medical distress or asks for medical attention would result in deprivation of constitutional rights because there had been a pattern of such occurrences and the policymakers were aware of the pattern.  Thus, the City of Fort Worth was deliberately indifferent to detainees' serious medical needs, including but not limited to those of Christopher Lowe, is liable for the failure to train and/or adopt necessary policies that would have likely prevented the death of Christopher Lowe.

47. The failure to provide medical assistance to detainees who specifically requested it and/or were in obvious need constituted a de facto policy in the City of Fort Worth based upon many years of failing to obtain such medical assistance and resulting in serious bodily injury or death. The Chief of Police, as the policymaker, was aware of this de facto policy and authorized/condoned and/or ratified it.  It is axiomatic that failing to provide medical assistance to someone who obviously needs it—even to a layperson—is likely to result in serious injury or

death.  The failure to enact such a policy was both a deliberate choice on the part of the Chief of Police and a moving force for the failure to provide necessary care to Mr. Lowe.

48. The unconstitutional actions of the Defendant were in accordance with the official or unofficial customs, policies or practices of the City of Fort Worth.  The City provided no training or policies for officers in addressing medical attention for detainees. As a result, it has been the custom and practice for officers to ignore serious medical needs of detainees or unreasonably delay medical assistance for serious medical needs of detainees.  This deliberate indifference has resulted in numerous instances of serious injury or death to detainees/inmates whose immediate medical needs have been ignored or dismissed by officers as detailed in par. 38, incorporated herein.  Plaintiff further asserts that there have been many additional instances that must be discovered through the discovery process in which Plaintiff seeks to engage prior to being required to respond to any motion to dismiss or for summary judgment.

49. Immediately prior to his death, Christopher Lowe suffered extreme pain and anguish. Defendants' acts, omissions, policies, procedures and/or customs as set forth above are the proximate cause of substantial damages to Christopher Lowe, including severe pain and suffering, both emotional and physical.  The Defendants had fair notice and thus knew or should have known that denying a person in custody immediate medical attention in an emergency situation is in violation of the Constitutional and statutory protections afforded to Christopher Lowe.  This law was clearly established at the time of the injury.  Plaintiff asserts wrongful death and survival claims for the emotional distress suffered by and constitutional violations against the rights of Christopher Lowe as well as the loss of his companionship and society.

50. Defendants' conduct has violated the Fourth and Fourteenth amendments to the United States Constitution.

51.     Plaintiff is entitled to recover attorneys' fees, costs, litigation expenses, and expert fees, as allowed, pursuant to 42 U.S.C. §1988, 12205.

## V. JOINT AND SEVERAL LIABILTY

52.     All Defendants are jointly and severally liable.

## VI. DEMAND FOR JURY

53.     Plaintiff requests a trial by jury.

## CONCLUSION AND PRAYER

THEREFORE, Plaintiff prays for judgment against all Defendants for actual and compensatory damages, declaratory relief, and for statutory attorneys' fees, costs, and expenses. She prays for punitive damages against the individual Defendants. Finally, she seeks all other additional relief as the Court deems just and proper.

Respectfully submitted,

s/Susan E. Hutchison
Susan E. Hutchison
Texas Bar No. 10354100
sehservice@hsjustice.com

James Robert Hudson, Jr.
Texas Bar No. 24094736
jr@hsjustice.com

HUTCHISON & STOY, PLLC
505 Pecan St., Ste. 101
Fort Worth, TX 76102
(817) 820-0100
817.820.0111 fax

ATTORNEYS FOR PLAINTIFFS