**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **Alexis Carlito-Garcias** | § | |
| **as** | § | |
| **Heir of Christopher Lowe** | § | |
| | § | |
| **Plaintiff,** | § | **Civil Action No.** |
| | § | |
| **VS.** | § | **4:20-CV-330-P** |
| | § | |
| **City of Fort Worth, Texas; Scott Smith;** | § | |
| **Christopher Golden; Mitchell Miller;** | § | |
| **Taylor Stephens; Daniel Pritzker;** | § | |
| **Andrew Scharf; and Hans Fellhauer,** | § | |
| | § | |
| **Defendants.** | § | |

---

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS

---

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff files this Response to Defendants' Motions to Dismiss as follows: Stephens' Motion to Dismiss Plaintiff's First Amended Complaint [ECF 37]; Golden and Millers' Motion to Dismiss Plaintiff's First Amended Complaint [ECF 36]; Pritzker and Fellhauer's Motion to Dismiss Plaintiff's First Amended Complaint [ECF 40]; Scharf's Motion to Dismiss Plaintiff's First Amended Complaint [ECF 42]; Smith's Motion to Dismiss Plaintiff's Original Complaint [ECF 22].[1] Plaintiff files this Response inclusive of the motions of the individual Defendants as the claims against them are based upon substantially similar facts. The Defendants each assert as a basis for dismissal the judicially created theory of "qualified immunity."

---

[1] To the extent that any Defendant's Motion to Dismiss (including the City of Fort Worth) addressed the Plaintiff's status to assert wrongful death claims, Plaintiff asserts that such has been cured by her First Amended Complaint omitting claims as a wrongful death beneficiary.

TABLE OF CONTENTS

**TABLE OF CONTENTS**................................................................................................i

**TABLE OF AUTHORITIES** ......................................................................................ii

**I.     SUMMARY** ...........................................................................................................1

**II.    STANDARD FOR 12(b)(6)**..................................................................................3

**II.    GOVERNING LAW REGARDING ASSERTION OF QUALIFIED IMMUNITY** .......3

**III.   FACTUALLY SPECIFIC ASSERTIONS DEFEATING QUALIFIED IMMUNITY** ...8

    A.     Events of July 26, 2018 ......................................................................................8

    B.     Internal Affairs Investigation and Findings Against Each Officer ...................13

      1.   INTERNAL AFFAIRS/DEPT FINDING AGAINST DEFENDANT MILLER ..............13

      2.   INTERNAL AFFAIRS/DEPT FINDING AGAINST DEFENDANT GOLDEN .............15

      3.   INTERNAL AFFAIRS/DEPT FINDINGS AGAINST DEFENDANT SMITH ..............17

      4.   INTERNAL AFFAIRS/DEPT FINDINGS AGAINST DEFENDANT FELLHAUER ....18

      5.   INTERNAL AFFAIRS/DEPT FINDINGS AGAINST DEFENDANT PRITZKER ........19

      6.   INTERNAL AFFAIRS/DEPT FINDINGS AGAINST DEFENDANT STEPHENS ........20

      7.   INTERNAL AFFAIRS/DEPT FINDINGS AGAINST DEFENDANT SCHARF ...........22

**IV.    APPLICATION OF LAW ON QUALIFIED IMMUNITY TO THESE FACTS** .........22

TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). ................................... 3

*Bell v. Wolfish,* 441 U.S. 520 (1979), 99 S.Ct. at 1872 n. 16 ....................................................... 7

*Casey v. Lewis,* 834 F.Supp. 1569 (D.Ariz.1993)........................................................................ 5

*City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605
   (1983)................................................................................................................................. 7

*Cuvillier v. Taylor,* 503 F.3d 397 (5th Cir.2007)........................................................................ 3

*Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752 (5th Cir. 2001) ............................... 4, 6

*Dyer v. Houston*, 955 F.3d 501 (5th Cir. 2020).................................................................... passim

*Estate of Wansley*, 524 Fed. Appx. 963 (5th Cir. 2013) .......................................................... 29, 30

*Estelle v. Gamble*, 429 U.S. 97,  97 S.Ct. 285, 50 L.Ed.2d 251 (1976)............................... 4, 7, 31

*Farmer v. Brennan*, 511 U.S. 825,  114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ................ 4, 5, 6, 31

*Garza v. City of Donna*, 922 F.3d 626 (5th Cir. 2019)............................................................ 4, 29

*Hare v. City of Corinth, Miss.*, 135 F.3d 320 (5th Cir. 1998) ...................................................... 7

*Harlow v. Fitzgerald,* 457 U.S. 800 (1982) ................................................................................ 7

*Harris v. Hegmann*, 198 F.3d 153 (5th Cir. 1999) .................................................................... 31

*Hope v. Pelzer*, 536 U.S. 730,  122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) ................................. 5

*International Woodworkers of Am., AFL–CIO and its Local No. 5–376 v. Champion Int'l.
   Corp.,* 790 F.2d 1174 (5th Cir.1986)...................................................................................... 7

*Johnson v. Hardin Co.,* 908 F.2d 1280 (6th Cir.1990) ............................................................... 5

*Johnson v. Johnson*, 385 F.3d 503 (5th Cir.2004)....................................................................... 3

*Jones v. Diamond*, 636 F.2d 1364  (5th Cir.1981)....................................................................... 7

*Jones v. St. Tammany Par. Jail*, 4 F. Supp. 2d 606 (E.D. La. 1998) ............................................ 5

*Jones v. Tex. Dept. Crim. Justice*, 880 F.3d 756 (5th Cir. 2018)................................................ 6

*LaFaut v. Smith,* 834 F.2d 389 (4th Cir.1987).......................................................................... 5

*Manis v. Lawson*, 585 F.3d 839 (5th Cir. 2009) ......................................................................... 4

*Morgan v. Swanson*, 659 F.3d 359 (5th Cir. 2011) (en banc)................................................. 4, 5

*Pearson v. Callahan*, 555 U.S. 223,  129 S.Ct. 808, 172 L.Ed.2d 565 (2009)............................. 4

*Rich v. Palko*, 920 F.3d 288  (5th Cir. 2019)............................................................................. 4

*Ruiz v. Estelle,* 503 F.Supp. 1265, 1345 (S.D.Tex.1980), *aff'd in part and rev'd in part,* 679 F.2d
   1115 (5th Cir.1982), *amended in part, vacated in part,* 688 F.2d 266 (5th Cir.1982), *cert.
   denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983)................................................ 5

*Sanchez v. Swyden*, 131 F.3d 1144  (5th Cir. 1998) ................................................................... 7

*Self v. City of Mansfield, Texas*, 369 F. Supp. 3d 684 (N.D. Tex. 2019).............................. 30, 31

*Smith v. Brenoettsy*, 158 F.3d 908 (5th Cir. 1998) .................................................................... 31

*Tamez v. Manthey*, 589 F.3d 764 (5th Cir. 2009) ....................................................................... 4

*Thompson v. Upshur Cty., Tex.*, 245 F.3d (5th Cir. 2001)...................................................... 4, 6

*Trevino v. Hinz*, 751 Fed. Appx. 551 (5th Cir. 2018) ........................................................ 29, 30

*U.S. v. Brown*, 623 F.3d 104 (2010) ........................................................................................... 3

## Other Authorities

https://www.merriam-webster.com/dictionary (July 2020) ......................................................... 30

**Rules**

FED. R. CIV. P. 12(b)(6) ................................................................................................................ 3

I.      SUMMARY

The individual Defendants in this case make the same assertions that every officer being sued in every civil rights case makes, regardless of the facts or circumstances, regardless of the law:  1. Plaintiff's allegations are "conclusory;"   2. Plaintiff can't prove intent to harm (despite the fact that this is no longer a required element in a 14th amendment claim);   3.  The officers thought the arrestee was faking;     4. It wasn't clearly established that an officer had to get medical care for a citizen in obvious medical distress (because <u>what if</u> they were faking?); 5. Citizens being arrested sometimes fake illness so why shouldn't the officers get to assume that obvious signs and symptoms of medical need are a ruse and ignore them?  6. If you can say "I can't breathe," it means you can breathe; 7. If you can take some steps with officers holding you up on either side threatening you, then you are "walking," 8. If you are repeatedly saying "I'm sick," and "I'm dying," and "I can't breathe," then you are "talking."

All of those same old assertions in every brief filed in every single case of failing to help someone in a medical crisis completely fail to address the things that separate this case from the cases cited:   these officers knew that Mr. Lowe needed immediate medical care.   There was no guessing involved.  There was no speculation.  Even if Mr. Lowe's clear and obvious medical need as reflected in the body camera footage and as he continually begged and pleaded is ignored (and, of course, it is supposed to be assessed in favor of the non-movant Plaintiff at this point), the officers themselves acknowledged their awareness of his need for medical treatment.   They discussed it—ALL of them—as a group.   Such was specifically found by the department's investigation, is well pleaded and must be assumed as true for purposes of the Defendants' motions.  Indeed, the department specifically found that the officers, under these circumstances,

had a "blatant disregard" for their obligation to get Mr. Lowe "immediate" medical attention because they had all been informed of Mr. Lowe's medical need and failed to respond.

Defendants aver that Plaintiff's allegations are "conclusory," yet Plaintiff has provided to the Court very specific facts about what was said, what actions occurred, what specifically the body camera footage shows, what the Internal Affairs investigation revealed, the knowledge of each officer and what the specific plan of the officers involved. The Defendants, on the other hand, simply offer statements such as Mr. Lowe was "indeed breathing, walking and talking to officers," without any factual basis or assertions whatsoever. For example, most of the Defendants claim that Mr. Lowe was "talking" (Scharf motion, p. 5; Pritzker and Fellhauer motion, p. 3; Smith motion, p. 10; Golden and Miller motion, p. 12). The TOTAL verbal statements by Mr. Lowe during the encounter were: "I can't" (in response to being commanded to stand up), "I'm sick," "yes sir," "I'm sick," "I'm dying," "wait, wait, wait, wait wait" (regarding not being able to walk), "I can't breathe," "I can't" (again regarding being unable to stand/walk), "wait, wait, wait, wait, wait (as they physically drag him and threaten him)" "I can't breathe," "AAAHHHHH," "NO, I CAN'T BREATHE," "I'm dying," "I can't breathe." That is what the Defendants are representing as Mr. Lowe "walking and talking to officers" before he died in the patrol car. Plaintiff set out this entire scenario, including who said what and when, in her First Amended Complaint.

These officers would have the Court believe that they are untrained to recognize serious medical need and can simply assume that anyone begging for help is faking or intoxicated. Such assertions belie their knowledge, training and obligations as first responders as well as their long-established legal responsibility to acknowledge and address obvious medical need. Any attempt by these officers to plead ignorance as an excuse—"we didn't know he needed medical care so

we can't be responsible"—is contradicted by the well pleaded facts that they did—each of them—know.  If they deny the well pleaded facts, then that simply creates a fact issue that must be resolved by a jury.  If they didn't know he needed medical care, why did the group decide on taking him to John Peter Smith Hospital and not to jail?  Why did they concoct a scheme to lie about what they knew concerning his obvious medical need and misrepresent that he was "crazy" so they wouldn't have to stand guard?   At the very least, these questions must be answered by the jury in this case.

## II.    STANDARD FOR 12(b)(6)

A party can seek dismissal of a complaint for failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6) . When considering a Rule 12(b)(6)  motion to dismiss, a court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir.2004) . "To survive a Rule 12(b)(6)  motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.' " *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir.2007).  That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

## II.    GOVERNING LAW REGARDING ASSERTION OF QUALIFIED IMMUNITY

According to the Fifth Circuit, "[t]he qualified immunity defense has two prongs: whether an official's conduct violated a statutory or constitutional right of the plaintiff; and whether the right was clearly established at the time of the violation." *Dyer v. Houston*, 955 F.3d 501, 506 (5th Cir. 2020)(citing *Brown*, 623 F.3d at 253; *Manis v. Lawson*, 585 F.3d 839, 843

(5th Cir. 2009)). "A court may rest its analysis on either prong." *Dyer*, 955 F.3d at 506 (citing *Morgan v. Swanson*, 659 F.3d 359, 385 (5th Cir. 2011) (en banc)); *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

The Fourteenth Amendment guarantees pretrial detainees a right "not to have their serious medical needs met with deliberate indifference on the part of the confining officials." *Thompson v. Upshur Cty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001) (citing, *inter alia*, *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). To succeed on a deliberate-indifference claim, plaintiffs must show that (1) the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) the official actually drew that inference. *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

"We note that some of our cases have posited a third element—that the official 'subjectively intended that harm occur.' *See Garza v. City of Donna*, 922 F.3d 626, 635 & n.5 (5th Cir. 2019) (citing, *inter alia*, *Tamez v. Manthey*, 589 F.3d 764, 770 (5th Cir. 2009)). A panel of our court, however, recently wrote that it 'cannot endorse [this] analysis' because it 'depart[s] from controlling Supreme Court and Fifth Circuit law.' *Garza*, 922 F.3d at 636 (collecting decisions)." *Dyer v. Houston*, --F.3d--, 2020 WL 3636334 at *4 (5th Cir. July 6, 2020).

Turning to prong two of the qualified immunity standard, "we ask whether there are genuine disputes of material fact as to whether 'the unlawfulness of the [Officers'] conduct was clearly established at the time.' " *Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019). "While the Plaintiff need not identify a case 'directly on point,' 'existing precedent must 'place[ ] the statutory or constitutional question beyond debate.'" *Dyer*, --F.3d--, 2020 WL 3636334 at *6 (5th

4

Cir. July 6, 2020) (*citing Morgan v. Swanson*, 659 F.3d 359, 372). "In sum, 'the salient question' we ask at prong two is whether the state of the law at the time of the incident 'gave [the Officers] fair warning that their alleged treatment of [plaintiff] was unconstitutional.'" *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *accord Morgan*, 659 F.3d at 372 ("The *sine qua non* of the clearly-established inquiry is 'fair warning.' ")).

In *Jones v. St. Tammany Par. Jail*, 4 F. Supp. 2d 606, 612 (E.D. La. 1998), the court explained that "[a] pre-trial detainee's constitutional right to minimally adequate care and treatment is not a novel proposition. At the time of plaintiff's arrest on October 4, 1996, it was clearly established as a minimum standard that a jail official violates a pre-trial detainee's Fourteenth Amendment right to due process if he acts with deliberate indifference to the serious medical needs of the detainee." "Also, it was clearly established that a due process violation occurs if a pre-trial detainee is subjected to conditions or restrictions that are not reasonably related to a legitimate governmental purpose." *Id. See also Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Casey v. Lewis,* 834 F.Supp. 1569, 1581 (D.Ariz.1993)(citing *LaFaut v. Smith,* 834 F.2d 389, 392–94 (4th Cir.1987); *Ruiz v. Estelle,* 503 F.Supp. 1265, 1345 (S.D.Tex.1980), *aff'd in part and rev'd in part,* 679 F.2d 1115 (5th Cir.1982), *amended in part, vacated in part,* 688 F.2d 266 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983)(disabled inmates must be provided with physical accommodations necessary because of their disabilities, including adequate toilet and shower facilities, as well as wheelchairs and other mobility aids); *Johnson v. Hardin Co.,* 908 F.2d 1280, 1284 (6th Cir.1990)) (prison official's denial of plastic wrap and crutches to prisoner with fractures to both legs held sufficient to amount to deliberate indifference to serious medical needs).

A cause of action for deliberate indifference to a detainee's medical needs can be maintained if there is a delay in access to medical care that results in substantial harm. Deliberate indifference also can be shown by proving that officers refused to treat the detainee, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly show that they had a wanton disregard for the detainee's serious medical needs. *Domino v. Tex. Dept. Crim. Justice*, 239 F.3d 752 (5th Cir. 2001); *Jones v. Tex. Dept. Crim. Justice*, 880 F.3d 756, 759 (5th Cir. 2018). An officer's knowledge of a substantial risk of harm may be inferred if the risk was obvious. *Farmer v. Brennan*, 511 U.S. 825, 842–43, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)

In *Thompson v. Upshur Cty., Tex.*, 245 F.3d 447, 452–454 (5th Cir. 2001), the Court found a fact issue where a jail sergeant failed to obtain medical assistance for a detainee with DT's, who then died. The Court stated that "[c]learly established law forbids a significantly exacerbating delay or denial of medical care to a detainee suffering from DTs." *Id*. at 463. In *Thompson*, It was found that "[a]ny reasonable jailer…'would have recognized the constitutional obligation to summon medical assistance well before Thompson died.'" *Id*. at 464; Recently, the Fifth Circuit in *Dyer, supra,* explained that "*Thompson* defines clearly established law in sufficient detail to have notified the Officers that their actions were unconstitutional." --F.3d--, 2020 WL 3636334 at *7 (5th Cir. July 6, 2020). In both *Dyer* and *Thompson*, some level of medical care was provided, after which the detainee's condition deteriorated and the jailers took no further action to assist. The *Dyer* Court holds that it was clearly established at least as of August 2013 (the date of Graham Dyer's arrest), that it was deliberately indifferent for officers encountering serious medical needs to fail to provide or summon medical assistance.

In fact,"the duty of law enforcement officials not to be deliberately indifferent to serious medical needs of pre-trial detainees has long been the minimum duty owed to a pre-trial detainee." *Hare v. City of Corinth, Miss*., 135 F.3d 320, 327 (5th Cir. 1998) (citing as authority *Estelle,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251; *Bell,* 441 U.S. at 535 n. 16, 99 S.Ct. at 1872 n. 16; *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983); *Jones v. Diamond,* 636 F.2d 1364, 1378 (5th Cir.1981), *overruled on other grounds by International Woodworkers of Am., AFL–CIO and its Local No. 5–376 v. Champion Int'l. Corp.,* 790 F.2d 1174 (5th Cir.1986).  The Fifth Circuit stated in *Hare* that "[t]he deliberate indifference test enunciated in our 1996 en banc opinion was a clearly established minimum standard of conduct when the incident occurred in 1989. In other words, at the very least, that standard was clearly established as of then. Therefore, it is that standard to which we hold the individual defendants in determining, objectively, the reasonableness of their conduct." 135 F.3d at 327 (*citing Sanchez v. Swyden,* 131 F.3d 1144, 1148 (5th Cir. 1998)("[T]he official's knowledge of the relevant law need not rise to the level of a 'constitutional scholar.' "); *Harlow v. Fitzgerald,* 457 U.S. 800, 815–17, 102 S.Ct. at 2736–38).

In *Dyer v. Houston*, --F.3d--, 2020 WL 3636334 (5th Cir. July 6, 2020), the Fifth Circuit found that genuine issues of material fact precluded qualified immunity for three police officers who transported a detainee to jail without acting in some manner to obtain medical assistance when the detainee, "in the grip of a drug-induced pyschosis," struck his head violently against the interior of a patrol vehicle repeatedly during transport.  *Id*. at *5.  The Court noted that the officers "were aware of a risk of injury to [the detainee] that they did nothing to alleviate"  and determined that it would be up to the factfinder to resolve whether the officers acted with deliberate indifference to serious medical needs.  *Id.*

III.     FACTUALLY SPECIFIC ASSERTIONS DEFEATING QUALIFIED IMMUNITY

A.     Events of July 26, 2018

This case arises out of the death of Christopher Lowe who died in custody of the Fort Worth police on July 26, 2018.

On July 26, 2018, Defendant Scott Smith was dispatched to a "prowler" call at a residence in Fort Worth.  When Defendant Smith arrived at the location, he saw Christopher Lowe sitting near the front of a white SUV that was parked in the resident's driveway.  Mr. Lowe was holding what appeared to be a small pipe and banged it lightly on a gate or metal bar.

At the time that Smith arrived, the resident of the house at which this was occurring was standing on the front porch, calmly watching Mr. Lowe.  There was another person standing in the yard, who began conversing with Defendant Smith.  Smith told that person that Lowe was "not really hurting anything right now" and that he, Smith was going get some back up.  Smith asked the various people standing around if they knew the person that was lightly banging the pipe and they responded that they did not.  Each person stood calmly observing, with no expression of concern for their own immediate safety.  Mr. Lowe made no verbal threats or threatening actions toward anyone.  He was obviously not in his rational mind and not fully aware of his surroundings.  None of the occupants or other persons standing calmly at the scene made any expressions of "terror" regarding Mr. Lowe.

Defendants Miller and Golden next arrived on the scene.  At that time, Mr. Lowe discarded the object in his hand.  One of the officers yelled "let's go! grab him!"  and they moved in to take Lowe into custody.  Defendant Miller violently threw Lowe onto his back. Lowe did not resist or struggle and responded with "ok, ok."  Mr. Lowe did not refuse any commands, make any threats, resist or struggle at any time during the entire encounter.

Mr. Lowe was commanded to roll onto his stomach and put his hands behind his back. He told the officers that he was "sick." He complied with their commands and responded with "yes sir" to commands while he was handcuffed.

The officers then directed Mr. Lowe to stand. He explained that he could not. Mr. Lowe was on his knees and he was directed to push his legs up and stand up. Mr. Lowe began to slump over on his side. Ignoring Mr. Lowe's obvious and noted distress, Defendant Smith yelled at him to "STAND UP!" Defendants Miller and Golden yanked Mr. Lowe up by his cuffed hands.

When Mr. Lowe was yanked to his feet, he was directed by Smith to "WALK!" even as Smith noted that Mr. Lowe's "eyes [were] bugged out." Officers Golden and Miller began walking Mr. Lowe down the driveway toward the street. Mr. Lowe once again began to slump to the ground when he was yanked back up and told to "stand and walk!" Mr. Lowe said again, "I'm sick." He once again began to slump and the officers dragged him for several steps before he was able to regain his footing. Mr. Lowe informed the officers that he was sick and that he was dying. It was ignored.

When the Defendants once again yanked Mr. Lowe to his feet, he tried to stop them and/or get their attention, crying out "wait, wait, wait, wait, wait." Defendant Miller's response was "you fall again, I'm just gonna let you fall." Mr. Lowe clearly stated "I can't breathe" and again "wait, wait, wait, wait, wait!" Golden's response was "don't pull that shit."

At that point, Mr. Lowe was slumped over with Defendants Golden and Miller holding him up in the street. It was very clear that Mr. Lowe was in extreme physical distress and unable to walk or stand on his own. In response to further instruction to "walk," Mr. Lowe once again stated that he could not.

During the encounter where the Defendants were forcing/dragging Mr. Lowe toward the patrol car, additional officers Pritzker and Fellhauer arrived. Mr. Lowe told all of the assembled officers (Smith, Golden, Miller, Pritzker, and Fellhauer) "I can't breathe." The officers—all of them—witnessed Lowe's distress and heard him state that he could not breathe and needed help. All of the five officers again completely ignored Mr. Lowe's protestations and physical condition and continued to force him toward the patrol vehicle. Mr. Lowe slumped forward, crying out "aarghhhhhhhh" and then, within the hearing of all officers, "NO, I CAN'T BREATHE!" The only response was from Defendant Miller, who said "yeah, you can." Lowe told the entire group of officers that he was dying. There was no response.

It was clear to each Defendant that Mr. Lowe's distress was not a matter of "passive resistance." If they had actually believed that his conduct in pleading for help, collapsing, inability to stand or walk, begging to go to the hospital and inability to breathe constituted "passive resistance" or "recalcitrance," they would have transported him to jail rather than concoct a scheme to avoid the emergency room (and accompanying guard duty) by misrepresenting what they knew to be physical distress and take him to the mental ward instead.

Similarly, if the Defendants believed that Mr. Lowe was simply "intoxicated," the plan would have been to take him to jail rather than the hospital. All of the named Defendants clearly knew that he needed to go to the hospital for medical care—they just formed a plan to misrepresent what they knew to be his condition to take him to a different part of the hospital than he needed—and that would not require them to stay and guard him.

Defendant Pritzker then took over for Miller. He helped force Mr. Lowe into the back of the patrol car. Mr. Lowe again cried out. The response from an [as yet unidentified] officer was "you spit on me, brother, and I'm gonna put your face in the f****** dirt!"

Despite each of the five officers being aware from the obvious physical and verbal distress of Mr. Lowe that he was in serious medical need, none of the officers took any action whatsoever to respond to Mr. Lowe's distress.  None of them called for an ambulance, called for assistance, moved to transport Mr. Lowe to the hospital or took any steps to provide aid for Mr. Lowe.  It is very clear from the body camera footage that Mr. Lowe's distress was both genuine and severe (as is later proven to be true from the fact that he died in the back of the police car).  Each of these Defendants was fully aware that Mr. Lowe needed immediate medical attention— as is proven by their group discussion in which each named officer was involved where they acknowledged he needed to go to the hospital but, instead, concocted a scheme to drop him off at the John Peter Smith mental ward in order to avoid having to perform guard duty at the emergency room.

Instead, after Defendants Scharf and Stephens arrived, all of the officers (Smith, Golden, Miller, Stephens, Pritzker, Scharf and Fellhauer) stood around in a group talking to each other at the scene.  Defendant Smith told the entire assembled group of officers at that time about Mr. Lowe's behavior, symptoms of drug overdose and that he had complained of his inability to walk or breathe.  Each of these officers was trained in and familiar with the symptoms of a drug overdose and was aware of the likelihood of serious harm or fatality associated with drug overdose.  There was no plan to take Mr. Lowe to jail, as would have been discussed if the officers believed he was not in medical distress.  All of the named Defendants in fact discussed and agreed as a group on the scheme to cover up their actual knowledge of Mr. Lowe's physical distress, clear signs of drug overdose and serious need for physical medical care and, instead, misrepresent his condition to mental health providers.  This specific scheme has been verified by the Acting Chief of Police in the disciplinary actions quoted below.

11

During the group discussion, it was determined that Golden would transport Mr. Lowe to the 10th floor of John Peter Smith Hospital for an emergency mental detention. Defendant Pritzker advised Defendant Golden to withhold information from hospital personnel by omitting the fact that they believed that Lowe was under the influence of narcotics in order to keep Lowe from having to be cleared medically before being admitted for the emergency mental detention and in order to avoid a hospital guard detail (signal 78). During this discussion, Defendant Stephens also advised to take Lowe "straight up and don't say anything else." Another officer added "don't say anything about the dope. He's just acting crazy." Regardless of which officer spoke which words, the entire group agreed either explicitly or complicitly to the scheme. There was no objection to this scheme raised by any of the named Defendants.

During the time that all of the named Defendants stood in a group and concocted the scheme to knowingly, purposely and intentionally misrepresent Mr. Lowe's need for physical medical care, Mr. Lowe remained in severe distress in the back of the police car. After Defendant Smith had briefed all of the Defendants about Mr. Lowe's distress, Mr. Lowe began to bang his head against the interior of the patrol vehicle as a call for help. Defendants Fellhauer and Golden went to talk with Lowe. Golden told Lowe "if you keep banging your head, I'm going to spray my pepper spray in there and it's gonna be worse." Mr. Lowe told them specifically that he needed to go to the hospital. Defendant Golden lied and told Lowe that they needed to know his name before they could take him to the hospital. Each named Defendant was within earshot of the exchange and was aware of Lowe's pleas and Golden's threats and lie. No named Defendant took any action to intervene or help Lowe. They obtained Lowe's identification and yet no ambulance was called and no effort made to transport him.

These individual Defendants each purposely denied the medical care they were absolutely aware that Mr. Lowe needed and intended to delay even the inappropriate care they intended to get him. The Acting Chief of Police has acknowledged that these Defendants should have called an ambulance to the scene.

Almost twenty minutes after Defendant Smith had encountered Mr. Lowe and recognized his symptoms of distress, they discovered Lowe unresponsive in the back the patrol car. Finally, an ambulance was called, but it was too late and Mr. Lowe was pronounced dead after he was transported to JPS Hospital.

Mr. Lowe died of acute cocaine intoxication. His death could have been prevented. With rapid response, cocaine overdoses can be treated. In the field, measures can be taken to cool a person down and, most importantly, to keep them calm. The Defendants did the opposite. More importantly, getting someone to a hospital immediately can change the outcome as giving an individual in such condition a sedative lowers their blood pressure and heart rate as well as substantially reduces any chance of heart attack or stroke.

The City, through the Acting Chief of Police, acknowledged the misconduct of each of the individual Defendants. In light of the specific findings, acknowledgement of wrongdoing and discipline of each individual Defendant by the City, the representations made by the Defendants in their filings in this case are shocking.

B.    Internal Affairs Investigation and Findings Against Each Officer

1.    INTERNAL AFFAIRS/DEPT FINDING AGAINST DEFENDANT MILLER

Defendant Miller was disciplined by the Acting Chief of Police for, among other things, "acts showing a lack of good moral character," "conduct prejudicial to good order," and "violation of an applicable Fire or Police Department rule, directive, general or special order."

The disciplinary action reads as follows:  "When Officer Miller arrived, Christopher Lowe was in front of a white SUV at the front of the residence.  Mr. Lowe was holding some type of metal type and was using it to hit the burglar bars of the window to the residence.  Shortly thereafter, Officers Miller and C. Golden arrived and Mr. Lowe threw the metal pipe away.  All three officers moved in toward Mr. Lowe and Officer Miller pulled Mr. Lowe away from the white SUV.  Officer Smith gave Mr. Lowe verbal commands to roll over onto his stomach and to put his hands behind his back.  At that time, Mr. Lowe stated that he was sick.  Mr. Lowe was cooperative and responded by saying: "Yes sir" to the officers' verbal commands.  Mr. Lowe was placed in handcuffs and told to stand up.  Mr. Lowe told the officers that he was not able to stand.  Officer Smith told Mr. Lowe, "Yes you can," and Officers Miller and Golden grabbed Mr. Lowe by his arms and pulled him to his feet.  Officers then escorted Mr. Lowe to a patrol unit with Officer Miller on his right side, holding his right arm, and Officer Golden on his left side, holding his left arm while Officer Smith was following.  Officer Smith told Officers Miller and Golden that Mr. Lowe's eyes were "bugged out."  During this escort, it was apparent that Mr. Lowe was having difficulty walking and he collapsed multiple times while telling officers that he was having trouble breathing.  At one point, Mr. Lowe collapsed and Officer Miller told him:  "You fall again, I'm just gonna let you fall."  Mr. Lowe again told the officer that he could not breathe, to which Officer Miller told Mr. Lowe:  "Yes you can."  Mr. Lowe then told the officers he was dying.  Officer D. Pritzker took over Officer Miller's position while escorting Mr. Lowe.  Officers Golden and Pritzker then placed Mr. Lowe in the back of a patrol vehicle. Officer Smith then briefed every officer at the scene about Mr. Lowe's behavior, symptoms and that he complained of his inability to walk and breathe.  Officer Miller failed to call an ambulance for Mr. Lowe so he could be medically evaluated after Mr. Lowe told Officer Miller

multiple times that he was sick, could not breathe and that he thought he was dying.  Officers have a duty to protect the rights of any person held in custody; a person requesting medical assistance or reporting medical distress should certainly receive assistance, especially from a first responder.....Officer Miller...has exhibited a blatant disregard for the policies and procedures of the Fort Worth Police Department." Officer Miller received indefinite suspension.

      2.     INTERNAL AFFAIRS/DEPT FINDING AGAINST DEFENDANT GOLDEN

Defendant Golden was disciplined by the Acting Chief of Police for, among other things, "acts showing a lack of good moral character," "conduct prejudicial to good order," and "violation of an applicable Fire or Police Department rule, directive, general or special order." The disciplinary action reads as follows:  "When Officer Golden and Officer M. Miller arrived at the call location, Christopher Lowe was in front of a white SUV at the front of the residence. Mr. Lowe was holding some type of metal type and was using it to hit the burglar bars of the window to the residence.  When Mr. Lowe threw the metal pipe away, officers moved in toward Mr. Lowe who was pulled away from the white SUV.  Officer Smith gave Mr. Lowe verbal commands to roll over onto his stomach and to put his hands behind his back.  At that time, Mr. Lowe stated that he was sick.  Mr. Lowe was cooperative and responded by saying: "Yes sir" to the officers' verbal commands.  Mr. Lowe was placed in handcuffs and told to stand up.  Mr. Lowe told the officers that he was not able to stand.  Officer Smith told Mr. Lowe, "Yes you can," and Officers Miller and Golden grabbed Mr. Lowe by his arms and pulled him to his feet. Officers then escorted Mr. Lowe to a patrol unit with Officer Miller on his right side, holding his right arm, and Officer Golden on his left side, holding his left arm while Officer Smith was following.  Officer Smith told Officers Miller and Golden that Mr. Lowe's eyes were "bugged

out."  While escorting Mr. Lowe, it was apparent that he was having trouble walking and he collapsed multiple times while telling officers that he was having trouble breathing.  At one point, when Mr. Lowe told the officers that he could not breathe, Officer Golden told him, "Don't pull that shit."  Mr. Lowe then told the officers he was dying.  Officers Golden and Pritzker then placed Mr. Lowe in the back of a patrol unit after Officer Pritzker had taken over for Officer Miller.   Officer Smith then briefed every officer at the scene, including Officer Golden, about Mr. Lowe's behavior, symptoms and that he complained of his inability to walk and breathe.  A short time later, Mr. Lowe began to bang his head against the interior of the patrol vehicle.  Officer Golden rolled down the back window of the patrol unit and told Mr. Lowe, 'If you keep banging your head I'm going to spray my pepper spray in there and it's gonna be worse.'  Officer Golden then asked Mr. Lowe for his name and Mr. Lowe responded that he needed to go to the hospital.  Officer Golden told Mr. Lowe that they needed his name before they could take him to the hospital.  Officer Golden told Mr. Lowe that they needed his name before they could take him to the hospital.  Once his identification was obtained, neither Officer Golden nor the other officers requested an ambulance at that time.  Officer Golden failed to call an ambulance for Mr. Lowe so he could be medically evaluated after Mr. Lowe told Officer Golden multiple times that he was sick, could not breathe and that he thought he was dying.  Officers have a duty to protect the rights of any person held in custody; a person requesting medical assistance or reporting medical distress should certainly receive assistance, especially from a first responder.....Officer Christopher Golden...has exhibited a blatant disregard for the policies and procedures of the Fort Worth Police Department." Officer Golden received indefinite suspension.

### 3. INTERNAL AFFAIRS/DEPT FINDINGS AGAINST DEFENDANT SMITH

Defendant Smith was disciplined by the Acting Chief of Police for, among other things, "acts showing a lack of good moral character," "conduct prejudicial to good order," and "violation of an applicable Fire or Police Department rule, directive, general or special order." The disciplinary action reads as follows: "When Officer Smith arrived at the call location, he located Christopher Lowe in front of a white SUV at the front of the residence. Mr. Lowe was holding some type of metal pipe and was using it to hit the burglar bars of the window to the residence. When Officers M. Miller and C. Golden arrived on scene to assist Officer Smith, Mr. Lowe threw the metal pipe away. All three officers moved in toward Mr. Lowe and Officer Miller pulled Mr. Lowe away from the white SUV. Officer Smith gave Mr. Lowe verbal commands to roll over onto his stomach and to put his hands behind his back. At that time, Mr. Lowe stated that he was sick. Mr. Lowe was cooperative and responded by saying: "Yes sir" to the officers' verbal commands. Mr. Lowe was placed in handcuffs and told to stand up. Mr. Lowe told the officers that he was not able to stand. Officer Smith told Mr. Lowe, "Yes you can," and Officers Miller and Golden grabbed Mr. Lowe by his arms and pulled him to his feet. Mr. Lowe was escorted to a patrol vehicle by Officer Miller who was on his right side holding his right arm, and Officer Golden on his left side, holding his left arm while Officer Smith followed. Officer Smith told Officers Miller and Golden that Mr. Lowe's eyes were "bugged out." During the escort, it was apparent that Mr. Lowe was having difficulty walking and he collapsed multiple times while telling officers that he was having trouble breathing. Officer Smith told Mr. Lowe: 'If you had all this energy to fight and hit the windows, you can walk.' At one point, Mr. Lowe stated to the officers, including Officer Smith, that he was sick and he was

dying.  Mr. Lowe was then placed in the back of a patrol vehicle by Officers [sic] Golden and Officer Pritzker; Officer Pritzker had just arrived at the scene.   Officer Smith then briefed every officer at the scene about Mr. Lowe's behavior, symptoms and that he complained of his inability to walk and breathe.  Officer Smith failed to call an ambulance for Mr. Lowe so he could be medically evaluated after Mr. Lowe told him multiple times that he was sick and could not breathe.  Officers have a duty to protect the rights of any person held in custody; a person requesting medical assistance or reporting medical distress should certainly receive assistance, especially from a first responder.....Officer Smith...has exhibited a **blatant disregard** for the policies and procedures of the Fort Worth Police Department." (emphasis added).  Officer Smith received a 90 day suspension.

      4.    INTERNAL  AFFAIRS/DEPT  FINDINGS  AGAINST  DEFENDANT FELLHAUER

Defendant Fellhauer was disciplined by the Acting Chief of Police for, among other things, "acts showing a lack of good moral character," "conduct prejudicial to good order," and "violation of an applicable Fire or Police Department rule, directive, general or special order." The disciplinary action reads as follows:   "On July 26, 2018, Officer Hans Fellhauer was dispatched to [Fort Worth address] to assist Officer Smith on a prowler call.  When Officer Fellhauer arrived, Christopher Lowe was being escorted to a patrol vehicle by Officer M. Miller and Officer C. Golden.   As Officer Fellhauer approached, Mr. Lowe said that he could not breathe and that he was dying.  It was apparent that Mr. Lowe was having difficulty standing when Officers Golden and D. Pritzker began to escort him to the patrol vehicle.   Officer Fellhauer followed as Mr. Lowe was being escorted and Mr. Lowe screamed out, 'No, I can't breathe!'  Officers Golden and Pritzker escorted Mr. Lowe to the back of a patrol unit and placed

him inside.  Officer Smith then briefed every officer at the scene, including Officer Fellhauer, about Mr. Lowe's behavior, symptoms and that he complained of his inability to walk and breathe.  Mr. Lowe soon began to bang his head against the interior of the vehicle.  When Officers Fellhauer and Golden went to talk with Mr. Lowe, they asked him for his name.  Mr. Lowe responded that he needed to go to the hospital.  Officer Golden told him that they needed to know his name before they could take him to the hospital.  Once his identification was obtained, no ambulance was called.   Officer Fellhauer failed to call an ambulance for Mr. Lowe so he could be medically evaluated after Mr. Lowe told Officer Fellhauer that he needed to go to the hospital.  Officers have a duty to protect the rights of any person held in custody; a person requesting medical assistance or reporting medical distress should certainly receive assistance, especially from a first responder....Officer Hans Fellhauer commissioned as a Fort Worth Police Officer on September 4, 2015, has exhibited a blatant disregard for the policies and procedures of the Fort Worth Police Department.  The facts as stated above convince me the above-cited sections of the Firefighters and Police Officers' Civil Service Rules and Regulations of the City of Fort Worth, and the Fort Worth Police Department General Orders/Code of Conduct, were in fact violated by Officer Fellhauer.....Therefore, I indefinitely suspend Officer Fellhauer."

     5.    INTERNAL AFFAIRS/DEPT FINDINGS AGAINST DEFENDANT PRITZKER

Defendant Pritzker was disciplined by the Acting Chief of Police for, among other things, "acts showing a lack of good moral character," "conduct prejudicial to good order," and "violation of an applicable Fire or Police Department rule, directive, general or special order."  The disciplinary action reads as follows:  "When Officer Pritzker arrived, Christopher Lowe was being escorted to a patrol vehicle by Officer M. Miller and Officer C. Golden.  As Officer

Pritzker approached Mr. Lowe, who was in handcuffs, and Mr. Lowe said that he could not breathe and that he was dying.  It was apparent that Mr. Lowe was having difficulty standing and Officer Pritzker took hold of Mr. Lowe's right arm.  he and Officer Golden then began escorting Mr. Lowe to a patrol vehicle as Mr. Lowe screamed out, 'No, I can't breathe!'  When they got to the back of the patrol vehicle, Officer Pritzker told Mr. Lowe, 'If you spit on me bud, I'm gonna put your face in the fucking dirt."  Then, Officer Pritzker and Officer Golden put Mr. Lowe into the back of the patrol vehicle.  Officer Smith then began briefing every officer at the scene about Mr. Lowe's behavior, symptoms and that Mr. Lowe complained of his inability to walk and breathe....[I]t was determined that Officer C. Golden would transport Mr. Lowe to the 10th floor of the John Peter Smith Hospital for an emergency mental detention.  An investigation conducted by the Internal Affairs unit revealed Officer Pritzker advised Officer C. Golden to withhold information from hospital personnel by omitting the fact that those and other officers believed Mr. Lowe was under the influence of narcotics, in order to keep Mr. Lowe from having to be medically cleared before being admitted for the emergency mental detention, thus avoiding a hospital guard detail.  Officer Pritzker failed to call an ambulance for Mr. Lowe so he could be medically evaluated after Mr. Lowe told him he could not breathe and after Officer Smith briefed him on Mr. Lowe's condition.  Officers have a duty to protect the rights of any person held in custody; a person requesting medical assistance or reporting medical distress should certainly receive assistance, especially from a first responder.....Officer Pritzker...has exhibited a blatant disregard for the policies and procedures of the Fort Worth Police Department." Officer Pritzker received indefinite suspension.

      6.     INTERNAL AFFAIRS/DEPT FINDINGS AGAINST DEFENDANT STEPHENS

Defendant Stephens was disciplined by the Acting Chief of Police for, among other things, "acts showing a lack of good moral character," "conduct prejudicial to good order," and "violation of an applicable Fire or Police Department rule, directive, general or special order." The disciplinary action reads as follows: "When Officer Stephens arrived, Christopher Lowe, the suspected prowler, was already in the back seat of a patrol car and Officer Smith began briefing every officer at the scene about Mr. Lowe's behavior, symptoms and that Mr. Lowe complained of his inability to walk and breathe. Several of the officers at the scene, including Officer Stephens, began discussing the best course of action to take now that Mr. Lowe was in custody. The involved officers discussed taking Mr. Lowe to the 10th floor of John Peter Smith Hospital for an emergency mental detention. Officer Stephens then advised the transporting officer to "take him straight up and don't say anything else." Another officer immediately clarified Officer Stephens' suggestion by adding "Don't say anything about the dope. He's just acting crazy." Officer Stephens' suggestion to her fellow officers that they intentionally omit information from hospital staff in order [sic] avoid having an officer assigned to guard Mr. Lowe in the emergency room was both immoral and unethical. Her advice was alarming and a complete violation of our Code of Ethics, and our Code of Conduct. As such it is an act showing a lack of good moral character that was prejudicial to good order. Officer Stephens failed to call an ambulance for Mr. Lowe so he could be medically evaluated after she learned Mr. Lowe complained of having difficulty breathing and walking. Officers have a duty to protect the rights of any person held in custody; a person requesting medical assistance or reporting medical distress should certainly receive assistance, especially from a first responder. Officer Stephens...has exhibited a blatant disregard for the policies and procedures of the Fort Worth Police Department." Officer Stephens received an indefinite suspension.

7.    INTERNAL AFFAIRS/DEPT FINDINGS AGAINST DEFENDANT SCHARF

Defendant Scharf was disciplined by the Acting Chief of Police for "violation of an applicable Fire or Police Department rule, directive, general or special order." The disciplinary action reads as follows: "When Officer Scharf arrived, he approached the officers already at the scene who were standing next to a patrol vehicle where the suspect, Christopher Lowe, was handcuffed in the back seat. Officer Smith then briefed every officer at the scene about Mr. Lowe's behavior, symptoms and that he complained of his inability to walk and breathe. Officer Scharf failed to call an ambulance for Mr. Lowe so he could be medically evaluated after he learned Mr. Lowe complained of having difficulty breathing and walking. Officers have a duty to protect the rights of any person held in custody; a person requesting medical assistance or reporting medical distress should certainly receive assistance, especially from a first responder.....Officer Scharf...has exhibited a blatant disregard for the policies and procedures of the Fort Worth Police Department." Officer Scharf received a five day suspension.

IV.    APPLICATION OF LAW ON QUALIFIED IMMUNITY TO THESE FACTS

As in *Dyer*, *supra*, "a reasonable jury could conclude that the Officers were either aware or should have been aware, because it was so obvious, of an unjustifiably high risk to [Plaintiff's] health," and did nothing to seek medical attention. *Dyer v. Houston*, --F.3d--, 2020 WL 3636334 at *4 (5th Cir. July 6, 2020).

The case *sub judice* provides an even stronger factual scenario for allegations of deliberate indifference to a serious medical need. In this case, the assembled officers were briefed by Defendant Smith on Lowe's apparent drug overdose, repeated protestations of inability to breathe, as well as his inability to walk. Each of these officers was trained in and

22

familiar with the symptoms of a drug overdose and was aware of the likelihood of serious harm or fatality associated with drug overdose.  There was no plan to take Mr. Lowe to jail, as would have been discussed if the officers believed he was not in medical distress, was simply being "non-compliant" or was merely "intoxicated."   In *Dyer*, the Court concluded that from the evidence, "a reasonable jury could conclude that the Officers 'were <u>either aware or should have been aware</u>, because it was so obvious, of an unjustifiably high risk to [Graham's] health," and did nothing to seek medical attention.  *Dyer*, --F.3d--, 2020 WL 3636334 at *8 (5th Cir. July 6, 2020) (emphasis added). In this case, the deliberate indifference of the officers is not only obvious from the body camera footage, the comments of the officers and their plan of action, but also verified by the findings of the Internal Affairs Investigation and resulting discipline of each individual Defendant in this case.    The law was clearly established at the time of the Defendants' encounter with Mr. Lowe that officers encountering a serious risk of medical need are required to obtain immediate medical attention, particularly where the need is obvious and/or there is indicia of such knowledge on the part of the officers.

Defendants in this case make cookie cutter allegations:

Plaintiff's facts are "conclusory":  Smith [ECF 22, p. 4, 6, 7]; Golden & Miller [ECF 36] p. 19; Fellhauer & Pritzker [ECF 41, p. 5—6, par. 10—11]; Stephens [ECF 37, pp. 3, 15]; and Scharf [ECF 42, pp. 2, 5].

Plaintiff cannot prove "intent to harm" (despite the 5th Circuit's specific recognition that it is not a requirement in a 14th amendment detainee case): Smith [ECF 22, p. 8]; Golden & Miller [ECF 36, p.19]; Fellhauer & Pritzker [ECF 41, pp. 14,n 16]; Stephens [ECF 37, p. 8]; and Scharf [ECF 42, p. 2].

Mr. Lowe was faking it or being recalcitrant:  Smith [ECF 22, pp. 10, 13]; Golden & Miller [ECF 36, p. 3]; Stephens [ECF 37, p. 13]; and Scharf [ECF 42, pp. 3, n. 5, p. 4]

If someone says that they can't breathe, then they can breathe: Smith [ECF 22, p. 10]; Fellhauer & Pritzker [ECF 41, p. 12]; Scharf [ECF 42, p. 4—he never actually stopped breathing]; Golden & Miller [ECF 36, p. 4].

Mr. Lowe was "walking" and "talking:"  Smith [ECF 22, pp. 10]; Golden & Miller [ECF 36, p. 3, 12, 16]; Fellhauer & Pritzker [ECF 41, p. 3]; Stephens [ECF 37, p. 13]; and Scharf [ECF 42, pp. 3, n. 5, p. 4]

First of all, most of their allegations are in direct contradiction to what was pleaded by the Plaintiff in this case.  They may not agree that the facts as pleaded are accurate but that does NOT entitle them to a dismissal.  At best, it entitles them to provide evidence of their alternate facts to the Court in the form of motions for summary judgment.

Also, Defendant denies that they "should have" known of a serious medical need.  What their positions and representations to the Court completely ignore is that they DID know.  The facts as pleaded by Plaintiff include that Smith briefed the entire group—each Defendant officer—on Lowe's bugged out eyes, his behavior, his symptoms and that he claimed an inability to walk or breathe.  They all were aware of the medical need to take Lowe to the hospital.  There was no discussion that he was exhibiting signs of a mental illness.  The reverse is true—they acknowledged that his signs and symptoms were NOT indicative of mental illness and so they concocted a plan to misrepresent his symptoms in order to take him to the mental ward.  There is no need to analyze this case under any of the "should have known" cases—whether the specific signs and symptoms would put an officer on notice, because they did, in fact acknowledge that they knew he had need for medical care and intentionally planned to deny it.

24

Furthermore, many of the Defendant officers asserting ignorance of the significance of a person who exhibits clear signs of distress and **repeatedly asks** for medical care rings as disingenuous. These officers do not go out into the field and encounter citizens without a level of knowledge regarding the fatal consequences of drug overdoses and their obligation to obtain medical assistance. They know what the signs and symptoms are and they know they cannot simply ignore pleas for medical assistance or assume that someone in that condition is "faking." Such assumptions are merely an excuse for abandoning their responsibilities as officers of the law.

Defendant Smith makes specific factual assertions in section III of his Answer "Factually Specific Assertion Of Immunity Pursuant To Schultea" [ECF 39, P. 8] that Plaintiff contends are, at the very least, material issues of fact to be resolved by a factfinder:

In paragraph 3.09, Defendant Smith states that "Lowe told officers he was sick, but he did not display signs or symptoms Officer Smith recognized as a serious medical condition." This gratuitous statement is directly contradicted by Mr. Smith's briefing of the assembled officers that Mr. Lowe was likely overdosing, that his eyes were "bugged out," that he was stating he could not breathe and he was unable to walk unassisted. It is further contradicted by the fact that the response of the assembled group was a determination to take Mr. Lowe to the hospital and not to the jail.

In paragraph 3.09, Defendant Smith states that "Lowe did tell officers he could not stand up or walk, but he was able to do both with assistance." This statement mischaracterizes both the body camera footage and the findings of the Internal Affairs Investigation, which show that Mr. Lowe had to have an officer holding either arm, that he collapsed several times and that each time he pleaded "wait, wait, wait" and stated that he was sick, dying and couldn't breathe.

During his initial collapse, the Defendant officers yanked Mr. Lowe to his feet, and he tried to stop them and/or get their attention, crying out "wait, wait, wait, wait, wait."  Defendant Miller's response was "you fall again, I'm just gonna let you fall."  Mr. Lowe clearly stated "I can't breathe" and again "wait, wait, wait, wait, wait!"  Golden's response was "don't pull that shit."  Defendant Smith was present and observed this.  When Mr. Lowe was slumped over with Defendants Golden and Miller holding him up in the street, it was very clear that Mr. Lowe was in extreme physical distress and unable to walk or stand on his own.  In response to further instruction to "walk," Mr. Lowe once again stated that he could not.

In paragraph 3.09, Defendant Smith states that "[w]hen Lowe stumbled, it was after his pants had fallen to his ankles and appeared to restrict Lowe's ability to walk."  As stated directly above, this is a mischaracterization of the facts and fails to mention Lowe's pleas that he was "sick," "dying" and "can't breathe."

In paragraph 3.10, Defendant Smith states that "[w]hen Lowe indicated to Officer Smith that Lowe could not breathe, it appeared to Officer Smith that Lowe was breathing."  This is a very tone-deaf comment in light of all of the in custody deaths where a detainee has stated that they could not breathe as they died in custody.  It is not a new or recent phenomenon and these officers were fully aware that a person who is becoming more and more short of breath can say "I can't breathe" while they are losing the ability to breathe—as demonstrated by the fact that Mr. Lowe died thereafter.  Defendant Smith himself believed that it was significant and relayed it to the assembled group as evidence of a medical crisis.

In paragraph 3.11, Defendant Smith states that "[b]ased on his experience, Officer Smith believed that Lowe's behavior and condition was consistent with someone not wanting to go to jail, and who may have been intoxicated, but who was not in need of emergency or immediate

medical care." If Defendant Smith and the assembled officers did not believe that Lowe was in need of immediate medical care, they would have planned to transport him to the jail rather than John Peter Smith Hospital. Indeed, the Internal Affairs Investigation and resulting disciplinary action against Defendant Smith, specifically find that "Officer Smith then briefed every officer at the scene about Mr. Lowe's behavior, symptoms, and that he complained of his inability to walk and breathe. Officer Smith failed to call an ambulance for Mr. Lowe so he could be medically evaluated after Mr. Lowe told him multiple times that he was sick and could not breathe. Officers have a duty to protect the rights of any person held in custody; a person requesting medical assistance or reporting medical distress should certainly receive assistance, especially from a first responder."

In paragraph 3.13, Defendant Smith states that he "did not see or hear anything during his interaction with Lowe that caused him to think Lowe was experiencing serious medical needs until near the end of the incident when he saw other officers performing CPR on Lowe." Again, this statement is contradicted by the body camera footage and the findings of the Internal Affairs Investigation as reflected in the disciplinary action quoted above.

In paragraph 3.14, Defendant Smith states that he acted in "good faith" and did not "intentionally or knowingly" violate any of Lowe's clearly established rights. In direct contravention of this gratuitous statement, the findings of the Internal Affairs Investigation resulted in Defendant Smith being found to have lacked "moral character," engaged in "conduct prejudicial to good order" and violated a "rule, directive, general or special order" by failing to obtain immediate medical assistance for Mr. Lowe under the circumstances.

To simply make an assumption, without considering the circumstances, that a detainee is somehow "faking" a serious medical need in order to avoid going to jail is a complete

abandonment of the Defendant officer's legal obligation to respond to a serious medical need.   If officers were permitted to assume that requests for medical assistance, statements about inability to breathe, and inability to stand or walk without assistance were all simply used by citizen detainees to avoid jail, then they would never be held responsible for failing to respond to an asserted and obvious medical need.

The Defendants each attempt to convince this Court that in the case *sub judice*, this is simply a matter of a "failure to recognize ambiguous symptoms as a medical emergency" and thus, cannot constitute deliberate indifference.  This is a disingenuous argument that deliberately ignores the facts that the Defendants not only recognized symptoms of a medical emergency, but discussed as a group the necessity to take Mr. Lowe to John Peter Smith Hospital. Their own disciplinary records include the resounding refrain that that these officers each had sufficient knowledge to know to call an ambulance, but did not.

If these Defendants believed that Mr. Lowe was "faking it," thus negating any responsibility to address his medical condition, they would have taken him to jail rather than concocting a plan to take him to JPS, yet avoid the necessity for additional guard duty.  The Defendants acknowledged Mr. Lowe's medical need to each other.  However, rather than getting him the medical assistance that they acknowledged he needed, they spent their time figuring out how they would not have to continue to be individually involved at the hospital.  While they were doing that, he died in the back of the patrol car.  Those facts take this case out of the realm of "we failed to recognize medical symptoms" and into the realm of "we knew he needed medical care but deliberately abandoned our responsibility for obtaining it."   Indeed, such deliberate indifference is absolutely verified by their own Chief of Police finding a "***blatant disregard*** for the policies and procedures of the Fort Worth Police Department" (emphasis

added).  The disciplinary actions against the Defendants find that they knew Lowe needed medical attention and they had a "**blatant disregard**" for following procedure in such a situation.

The Defendants cite to various cases for the proposition that they did not act with deliberate indifference.  However, for the following reasons, such cases are inapposite to the set of facts before this Court.  In *Estate of Wansley*, 524 Fed. Appx. 963 (5th Cir. 2013)(a case not selected for publication), a jail detainee died from alcohol poisoning while in jail custody.  First, the opinion found that the deliberate indifference claim failed because the plaintiff had not presented evidence that the jailers *intended* the harm.  Id. at 971-72.  This requirement to establish deliberate indifference has subsequently been specifically rejected by the Fifth Circuit—there is no longer a requirement to prove intent to cause harm.  *Dyer v. Houston*, -- F.3d--, 2020 WL 3636334 at *4 (5th Cir. July 6, 2020)(such a requirement "depart[s] from controlling Supreme Court and Fifth Circuit law," citing *Garza v. City of Donna*, 922 F.3d 626, 635 & n. 5 (5th Cir. 2019)).   Furthermore, with respect to the finding of no deliberate indifference in *Wansley*, the detainee did not ask for medical help, she "was able to carry on a conversation," "she did not stumble, fall, or trip on the way to her cell.  The only distress she expressed was at not being able to see her grandchildren because she was arrested."  524 Fed. Appx. at 966-67.   Those facts are vastly different than Mr. Lowe's situation where he specifically stated repeatedly that he could not breathe, that he was sick, that he was dying and where the officers themselves specifically acknowledged his medical need.

The Defendants also cite to *Trevino v. Hinz*, 751 Fed. Appx. 551 (5th Cir. 2018)(also a case not selected for publication) to attempt to assert no deliberate indifference.  Just as in *Wansley, supra*, the detainee in *Trevino,* was in the process of being taken to jail—not to the

29

hospital.  Trevino was initially breathing fine and conversing with the officers.  751 Fed. Appx. at 552-53.  After a search revealed methamphetamine, Trevino refused to say anything.  *Id*.  At one point, she claimed to be having a seizure, but she "seemed to be breathing fine and talking with the officers."  *Id*.  The officers asked Trevino if she had medical issues and wanted an ambulance but she "denied ingesting drugs and did not ask for an ambulance."  *Id*.   As with *Wansley, Trevino* is limited to its facts, which are inconsistent with those before this Court.  Another case relied upon by Defendants is *Self v. City of Mansfield, Texas*, 369 F. Supp. 3d 684 (N.D. Tex. 2019) which reviews claims against jail supervisors and a municipality based upon policies and procedures and does not address an arrest of a detainee and individual officers' responses.  It does, however, acknowledge that "indifference on the part of a government employee can be evidenced by intentionally denying or delaying access to medical care or by intentionally interfering with the treatment prescribed."  Id. at 698.  The present case is substantially more similar to the cases relied upon by Plaintiff that establish that under these circumstances, Defendants were deliberately indifferent to a serious medical need and such was a violation of clearly established law.

The Chief of Police of the Fort Worth Police Department found that the Defendant officers, in failing to provide medical assistance to Mr. Lowe, acted with "blatant disregard for the policies and procedures of the Fort Worth Police Department."  Merriam-Webster's dictionary defines "blatant" as "completely obvious, conspicuous or obtrusive, especially in a crass or offensive manner."  (https://www.merriam-webster.com/dictionary/blatant).  It defines "disregard" as "to pay no attention to: treat as unworthy of regard or notice."  (https://www.merriam-webster.com/dictionary/disregard).  Thus, their own chain of command determined from the available evidence, body cam video, Internal

Affairs Investigation, witness interviews and statements that the Defendant officers, including Defendant Smith, paid no attention to completely obvious, conspicuous medical need on the part of Christopher Lowe.

For an official to act with deliberate indifference, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Such indifference on the part of a government employee can be evidenced by intentionally denying or delaying access to medical care or by intentionally interfering with the treatment prescribed. *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). *Self v. City of Mansfield, Texas*, 369 F. Supp. 3d 684, 698 (N.D. Tex. 2019)

There were other cases cited by the Defendants as well, but in none of them was there evidence that the officers actually acknowledged the need for medical care and then intentionally denied it. In the cited cases, the courts addressed whether the Defendants should have understood the risk bases upon the condition of the detainee. The clear distinction between the case *sub judice* and the cases cited by Defendants is that in the cited cases, the officers had no awareness of a substantial risk of serious harm. Whereas here, the Defendant officers' awareness is amply demonstrated by their group discussion acknowledging need for medical treatment, combined with Mr. Lowe's exhibiting of symptoms evidencing a clear medical need. All of the circumstances combined: Smith's assessment that Lowe's eyes were "bugging out," Lowe's repeated requests for medical care, Lowe's repeated statements that he could not breathe, Lowe's statement that he was dying, Lowe's physical manifestations of crisis and, subsequently, Smith's

specific statements to the assembled officers that Lowe was suffering a drug overdose, could not breathe and could not walk, completely separate this case from those where officers can claim lack of awareness of a substantial risk of harm.   Mr. Lowe's need for immediate medical assistance was obvious to any police officer—as verified by the findings of the Internal Affairs investigation.  None of the Defendant officers are entitled to qualified immunity.

FOR THE REASONS STATED, Plaintiff prays that the Motions to Dismiss be denied and for such further relief as justice may require.

Respectfully submitted,

Susan E.  Hutchison
Texas Bar No. 10354100
sehservice@hsjustice.com

HUTCHISON & STOY, PLLC
505 Pecan St., Ste. 101
Fort Worth, TX  76102
817.820.0100
817.820.0111 fax

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon all parties and counsel of record this the 16th day of July, 2020 through the ECF System for the Northern District of Texas.

/s/Susan E. Hutchison
Susan E.  Hutchison